Due to the unusual circumstances surrounding the placement of the' child with the respondents and the charges and counter-charges hurled at one another, the court in order to arrive at a proper determination permitted counsel to fully develop their respective cases. The hearing extended into 13 days of testimony with a record of approximately 1,500 pages. To sift the essential facts from the great mass of evidence and to properly evaluate such facts was a burdensome task.
The facts, briefly, reveal that on February 10,1957 the relator, then an unwed mother of 14 years of age, gave birth to the infant, the subject of this proceeding. From this point on the testimony as to how the child came into the custody of the respondents is directly in conflict, the relator and her witnesses contending that they left the hospital on February 14, 1957 in the car of the relator’s father with the baby in her lap, she sitting in the rear of the car, and that after proceeding for a short distance it came to a stop. The respondents’ car which had been following them also stopped and a man got out of that car, opened the door of the relator’s car, took the baby by force from the arms of the relator, went back to the vehicle behind them and drove away. The physical taking of the child occurred in a two-door vehicle and at no time did the relator or her witnesses see the face of the man who allegedly forcefully removed the child. She further testified that she *191 never saw the infant again until the instant proceedings came on for a hearing. On cross-examination the relator changed her story by stating that her father took the child from her and gave it to the unknown man.
The respondents on the other hand testified that prior to the birth of the child they had discussed this matter with the relator’s father who had expressed his intention of turning the child over to them for adoption; that on the date in question, and prior to going to the hospital to take the relator home, they and their attorney appeared at the home of the" relator and, in the presence of relator’s father, mother, brother and sister as well as a friend of the family, discussed the details of taking the child and adopting it. Arrangements were made for the payment of the various bills of confinement. After leaving the relator’s home they then proceeded to the hospital where they met the relator for the first time and she asked them to take good care of the baby. They then left the hospital in their respective cars and after driving some distance they stopped and relator handed the baby over to them asking that they take good care of him.
While there is a marked conflict in this testimony, the court is inclined to give greater credence to the respondents’ testimony as it would appear to be a physical impossibility to remove the child from the relator’s arms without the occupants seeing the person perpetrating the act. It is the court’s view that the relator gave up the child on the advice, request and direction of her parents.
It must be emphasized at this time that this is not an adoption proceeding where the court must determine from the evidence whether a complete severing of all ties between the parent and child is required (Matter of Paden, 181 Misc. 1025; Matter of Cohen, 155 Misc. 202), but rather a proceeding to determine the custody of a child in which the court, in addition to other factors, must determine the moral and temporal interests of the child.
While the facts in People ex rel. Kropp v. Shepsky (305 N. Y. 465) are not analogous as the mother there requested the return of her child within two weeks after placing it with the proposed foster parents, the rule of law laid down by the court therein must be the guide and the lines which this court must follow. There the court stated (pp. 468-469): “ It has often been said that a child’s welfare is the first concern of the court upon a habeas corpus proceeding where the judge acts ‘ as parens patries to do what is best for the interest of the child ’ * * *. However valid this statement may be in a contest for custody involv *192 ing the parents alone, it cannot stand without qualification in a contest between parents and nonparents. The mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood. * * * he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s icelfare compels awarding its custody to the nonparent.” (Emphasis supplied.) (See, also, People ex rel. Portnoy v. Strasser, 303 N. Y. 539.) The court further stated that this is true even if the nonparent initially acquired custody of the child with the parent’s consent.
In the light of the foregoing this court must, therefore, determine from the evidence whether the relator has by her action or lack of action abandoned the child, or whether she is unfit and the child’s welfare requires the granting or denial of the application.
. It is well established that if a parent has abandoned the child, he or she has no right to regain custody against the foster parents, particularly where it would be detrimental to the best interests of the child. What constitutes abandonment has been defined as any conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. (Matter of Farquharson, 102 N. Y. S. 2d 230; Matter of Davis, 142 Misc. 681; Matter of Anonymous, 13 Misc 2d 653; Matter of Anonymous, 16 Misc 2d 1010.)
An issue thus presented herein is whether the respondents have sustained the burden of establishing such abandonment on the part of the relator, either expressly or by implication.
The testimony of the relator and her witnesses reveals that after the child was turned over to the respondents, the relator made a number of requests of her father to aid her in securing the return of the child, but such requests were unheeded; that after marrying her present husband on May 20, 1957, approximately three months later her husband interceded with her father, requesting the return of the child and was told by him not to discuss it any further. Other than these requests no further action was taken by the relator to locate her child until January, 1960. To sustain this lack of effort on her part to .regain her child, the relator and her witnesses testified that the father ruled his home with an iron hand, was domineering and tolerated no interference with his judgment and decision, and required his wife and children to submit to his judgment without question or protest. The relator being unwed and *193 having made her home with her father could not incur the displeasure of her father.
Giving the relator the benefit of all doubts relative to her home life during this trying period, the subsequent events point to a definite relinquishment of her parental rights. As the court stated in Matter of Maxwell (4 N Y 2d 429, 433): “ The mother did not, it is true, leave her child on a doorstep, but surely an abandonment may be established by proof of conduct less drastic than that. Just as plainly, a settled purpose to be rid of parental obligations and to forego all parental rights spells out abandonment.” There can be no question that the relator removed herself from the alleged domineering influence of her father when she married three months later and took up her abode in her own home. Even assuming the tentacles of the father’s oppressive domination reached over and extended to her own home, such influence and control surely must have terminated and dissolved completely when her father passed away in January, 1958. Yet, in spite of the freedom she obtained by her marriage and the disappearance of any alleged fear of her father upon his death, no action was taken by her with regard to the child. It is undisputed that neither she nor her husband ever went to the police, the church, the District Attorney, Legal Aid Society, Surrogate’s Court or any other agency to obtain help in locating her child. Regardless of what may have been the reason for the relator turning over her child to the respondents, her complete inactivity and indifference to locating her child until approximately three years later clearly evinces an utter disregard of the exercise of her parental duties.
This neglect is further exhibited by the lack of action taken by the relator and her closest advisor, a woman who had a semi-official connection with the Police Department of the town where the petitioner resided, who the court believes was present at the conference on the day the child was placed with the respondents, who was in the car of relator’s father when the child was turned over to the respondents and who, if she did not know the names of the respondents or their attorney, could easily have acquired such information. The story of the relator that she asked this friend for help and was advised by her to wait until she was 18 years of age and then seek the baby, is unworthy of belief. Testimony was further elicited that another friend of the family, who was best man at the subsequent religious wedding of relator’s parents and who arranged the placement of the child, was at all times available but that no one ever approached him concerning the child’s whereabouts after its placement.
*194 The court under these circumstances owes an obligation to the child and the custodial parents to. find an abandonment. The. respondents have made a proper showing that the relator neglected and refused to perform her natural and legal obligations of care and support when she withheld her presence, failed in demonstrating parental affection and was completely indifferent to how her child was faring. Failure to perform such duties by a parent constitutes a relinquishment of parental claims and an abandonment of the child. (Matter of Anonymous, 13 Misc 2d 653, supra, Matter of Anonymous, 9 Misc 2d 420; Matter of Paden, supra, Matter of Hayford, 109 Misc. 479, 481; and cases cited in dissenting opinion in Matter of Bistany, 239 N. Y. 19.)
As to the issue of the relator’s fitness, the respondents have not only charged her with being a person of loose moral character dating to 13 years of age and continuing to date, but in addition evidencing an indifference toward her child for approximately three years. In Matter of Cleaves (6 A D 2d 138, 141-142) the court in defining the word “unfitness” stated: “Neither, under the authorities, must ‘unfitness’ approach moral turpitude. Within the judicial definition of an unfit parent is included, of course, one who is 1 a drunkard, an incompetent, a notoriously immoral person ’ but the definition comprehends, as well, one * * * whose conduct evinces indifference and irresponsibility”. While the court in People ex rel. Kropp v. Shepsky (supra) indicated that a court in such a proceeding should not weigh too heavily indiscretions of long-ago, from the record as a whole in the instant case the unfitness of the relator is inescapable.
The very nature of the relator’s background, the various indiscretions committed prior to the birth of the child, in conjunction with her alleged indiscretions subsequently with one of respondents’ witnesses after her marriage, leaves the court with no alternative other than to find her unfit. While it may be true that the respondents’ witness who testified as to his normal and abnormal sex relations with the relator subsequent to her marriage may have been motivated in so testifying by his desire to seek revenge for the severe physical beating inflicted upon him by relator’s husband and brother, and magnified and enlarged upon the actual events, leading to inconsistencies, his testimony received some corroboration from the relator herself who admitted having been in his company and indulging in amorous conduct short of an adulterous relationship. The very background of the witness, his conviction and his propensity for committing sexual acts clearly demonstrate that he bordered *195 upon being a sex pervert and would not take up with a woman unless his lustful cravings were satisfied. Adding this conduct with the past history of promiscuity on the relator’s part leads the court to believe that moral turpitude was practiced by the parties.
Carrying over the issue of relator’s fitness to a much more recent date, we have the testimony of the process server when he was effecting the service of the citation in the adoption proceeding as to the vile and degrading language used by the relator at that time. While it is true this was denied by the relator and a witness was produced in her behalf who claimed she had not heard the alleged abusive language even though it was established that the witness was indoors with all the windows closed and resided about 60 feet away, the court feels that with the relator’s past associates and experiences that such epithets were possibly hurled at the witness.
The relator instead of holding on to the child and reconstructing her life as a mother gave the child up, went her own way, failed to take any material steps to contact or regain the child for approximately three years, and negated her duties as a mother. This history of abrogation of her responsibilities as a mother constitutes additional unfitness.
Finding that the respondents have established not only the relator’s unfitness but also her abandonment of her custodial rights as well, the court now turns to the remaining and most important issue of whether the child’s welfare would be best promoted by denying the writ and leaving the child with the respondents.
The undisputed fact is that the relator for three years permitted this infant to remain in the care of a family who raised the child with love and affection, a child who knows no other mother or father than the respondents and who is well adjusted and fully integrated in the respondents ’ family. She, the relator, has permitted the child during this time to become accustomed to a manner of life, to make attachments and associations of which he cannot, without material injury to him, be deprived without seriously endangering his happiness and well-being.
The court’s concern is less with the rights of the disputing parties than with the rights of the child and his normal personality development. To this child the respondents are the only parents he has ever known and must be to him his true parents. The nature of the love and affection between the child and the respondents is such that an arbitrary disruption would possibly be highly traumatic. The testimony of various renowned experts of high reputation in the psychiatric and *196 medical field produced by the respondents clearly demonstrates the danger of severing the relationship of the child with the respondents. It was their considered opinion, under the circumstances presented herein, that a sudden break in the tie between respondents and the child would produce a marked emotional disturbance in the child with a strong likelihood of long-lasting and serious personality problems; that such a removal from a loving and secure environment would lead to anxiety and despair over what the child may be apt to view as desertion or rejection by loving parents, and uncertainty as to who would love and nurture him in the future.
The cases are legion where considerations affecting the best interests and welfare of the child may justify a court in withholding custody even from a parent. (People ex rel. Destasio v. Perruzza, 277 App. Div. 996; Matter of Vzga, 200 Misc. 732; People ex rel. Walters v. Davies, 143 Misc. 759.) Can it be said that the best interests of the infant will be promoted if he is deprived of the affection, sympathy and devotion so essential to his welfare or that the future of the child will be benefited by tearing him away from the respondents?
The court, however, wishes to state at this time, and sincerely hopes the Legislature will take cognizance of it, that appropriate legislation should be enacted which would prevent transfer of a child from an unmarried mother to the custodial parents, unless supervised by the court or appropriate agency. A child should not be treated as a pawn and must receive maximum protection and stability from the time of birth through the period of transfer. Indiscriminate transfers of this type have wrought unhappiness and distress. The taking of an infant child, even with the natural mother’s consent, at a time when she is still under the stigma of public and parental disapproval, with its consequent mental insecurity, and the transferring of the custody of the infant to others merely because of their great desire for an infant child without any legal proceedings or approval by a competent court, should be characterized as being against public policy, and prohibited by law.
Accordingly, the writ is dismissed. The court orders that the papers in this proceeding be filed in the County Clerk’s office and sealed, and that they be subject to the inspection of no persons other than the Surrogate’s Court, the parties hereto or their duly authorized attorneys, except upon an order herein entered on notice to all parties concerned. Submit order.