Fuld, J.
This contest between the natural mother and foster parents over the custody of a child, now almost 5 years old, gives rise to questions which are always distressing and usually perplexing as well. Their answer in this case depends upon our assessing the evidence offered at the trial and determining whether the foster parents have sustained the burden *335 of proof imposed upon them by our decisions. (See, e.g., People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469.)
When the relator was 14 years old and unmarried, she gave birth to a son who was turned over to the foster parents when he was 4 days old. The identity of the child’s father was uncertain. She had had sexual relations with 3 boys when she was 13; one of these is now her husband, but (according to her) definitely not the father. Some 3 years after the child’s birth, the relator brought the present habeas corpus proceeding to obtain the child’s custody. The court at Special Term dismissed the writ, finding that the mother abandoned the child, that she is unfit to assume his care and that his welfare requires that he remain with his foster parents (27 Misc 2d 190). A divided Appellate Division reversed and sustained the writ, disagreeing with the trial court on each of the issues raised (14 AD 2d 41).
This court has said that, where the contest for the custody of a child is between parent and nonparent, 1 ‘ the primacy of parental rights may not be ignored ’ ’ (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469, supra), but it has never been held or suggested that the child’s welfare may ever be forgotten or disregarded. In other words, the law presumes that it is in the child’s best interests that he be raised by his natural parent, but this presumption fails when it is proved that the parent has abandoned the child or is not fit to rear him. “ The mother or father has a right to the care and custody of a child, superior to that of all others, unless ”, we pointed out in the Kropp case (305 N. Y., at p. 468), “ he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood.”
Little purpose is to be served by treating at length the sordid and unhappy story unfolded by the record before us. It is enough to say, with respect to the relator’s abandonment of her child, that, from the time she gave him up in February, 1957, when he was but a few days old, until she commenced the present proceeding in February of 1960, the relator not only took no formal steps to gain the baby’s custody, but made not the slightest inquiry as to his whereabouts or health.[1]
*336 This total lack of concern and interest on her part takes on added significance in view of the fact that, having married a few months after the baby was born, she could have given him a home. We conclude, therefore, that the trial court correctly decided that the foster parents sustained their burden of establishing abandonment, of establishing that the relator’s conduct reflected “ a settled purpose to be rid of all parental obligations and to forego all parental rights ”. (Matter of Maxwell, 4 N Y 2d 429, 433; see, also, People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469, supra; Matter of Benning [Nigro], 303 N. Y. 775.) No matter how strongly one may favor the primacy of parental rights, the conclusion is well-nigh unavoidable — to cull from a sentence in the Maxwell case (4 N Y 2d, at p. 433)—that the relator’s “ callous disregard ” for the child and her “ complete indifference ” to where he was or how he was faring reflected a repudiation of motherhood and an abandonment of maternal rights and responsibilities.[2]
It is likewise our conclusion that the foster parents satisfied the burden imposed upon them of proving that the relator is unfit and that the child’s well-being requires that he be left in their custody. Based on evidence of her sexual promiscuity at the age of 13 and of indulgence at 16 in both normal and abnormal sex relations with a married man over a period of several months while separated from her husband, the trial court had little alternative but to find the relator unfit to raise the child. It follows, both from this proof and from the testimony given by the psychiatrists on behalf of the foster parents, that the child would be irreparably and irrevocably harmed if transferred to the relator, that the youngster’s welfare requires that he be left where he is.
*337 It is quite true that the record contains no proof that the relator was promiscuous or guilty of Immoral acts within a year of the trial, but her misconduct may not be characterized as “indiscretions of long ago”. (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 471, supra.) In cases of this kind, our only index to the future is the recent past, and the proof, revealing serious flaws of character and a decided moral instability over the years, affords no basis for believing that she is ready to take on the obligations of parenthood. In short, the trial judge’s appraisal—that the relator’s unfitness for the role of mother is “inescapable”—borne out, as it is, by the record, fully justified his refusal to assume that she had undergone such a change in character, propensities or outlook to warrant the risk of removing the child from the custody of the foster parents and turning him over to the relator.
The order of the Appellate Division should be reversed and that of Special Term reinstated, without costs.

. Although the relator testified that she did not know who the foster parents were, the evidence is clear that she could easily have learned their identity.

. The facts revealed by the present record are patently different from those in People ex rel. Kropp v. Shepsky (305 N. Y. 465, supra). In the first place, the unmarried mother in Kropp actually requested the child’s return less than two weeks after giving him up and, in the second place, she had no home in which to rear him and no means to provide for his support. Here, on the other hand, except for about three months, while the relator was living with her father and the other members of her family, she had a home of her own and, with her husband, could have provided for the care and support of the child. Moreover, as already remarked, she did nothing for a period ot' three years, permitting the baby to remain with those who were giving him the care and affection of parents.