Jones, J. (dissenting).
I cannot agree with the views announced today by the majority. I must conclude that the decision and the opinion of the Supreme Court of the United States in Stanley v Illinois (405 US 645) dictate a reversal.
In the first place, on the due process aspect of the case, I take it that all the members of the court agree that an unmarried father has such a "cognizable and substantial” interest in the custody of his illegitimate children as entitles him to notice of proceedings for the adoption of such children (Rothstein v Lutheran Social Servs. of Wis., 405 US 1051; Doe v Department of Social Servs. of City of Poughkeepsie, 71 Misc 2d 666; People ex rel. Slawek v Covenant Children’s Home, 52 Ill 2d 20; State ex rel. Lewis v Lutheran Social Servs., 59 Wis 2d 1). Thus, if the paternity of the unmarried father is established, as by an order of filiation made by a court of competent jurisdiction, he is entitled to participate in the adoption proceeding at least to the extent of contending that the proposed adoption will not be in the best interests of the child.
The right of active participation in presenting evidence and in making arguments with respect to the ultimate issue before the adoption court—the best interests of the child—is not at all the same, however, as requiring the consent of the father as a prerequisite to granting the adoption—in effect granting him not only a right of participation but also a potential right of veto. It is appellant’s position, predicated on the equal *579 protection clause, that such latter right must be accorded to unmarried fathers to the same extent that it is granted to married fathers. In my view, the opinion in Stanley mandates our acceptance of appellant’s contention.
It is true that the precise issue decided in Stanley was much narrower. An Illinois statute was held unconstitutional when, after the death of an unwed mother, it gave the right of custody of the child to the State in preference to the right of the unmarried father, a right denied the State in the case of a married father. The language chosen to express the position of the court, however, is very broad indeed.
In effect Stanley held that a State may not terminate the relationship between an unmarried father and his illegitimate child on any ground other than one on which the relationship of a married father with his legitimate child may be terminated, and that any statute authorizing a different result is unconstitutional (405 US, at p 658). The court in Stanley rejected the contention that the (p 653, n 5) "group of children who are illegitimate are distinguishable from legitimate children not so much by their status at birth as by the factual differences in their upbringing.” It was not persuaded by Illinois’ insistence (p 654) "that most unmarried fathers are unsuitable and neglectful parents.” The majority were charged by the dissenters with ignoring arguments (p 661, n 1): "that in the case of a married couple to whom a legitimate child is born, the two biological parents have already 'signified their willingness to work together’ in caring for the child by entering into the marriage contract; it is manifestly reasonable, therefore, that both of them be recognized as legal parents with rights and responsibilities in connection with the child. There has been no legally cognizable signification of such willingness on the part of unwed parents, however, and 'the male and female * * * may or may not be willing to work together towards the common end of child rearing.’ To provide legal recognition to both of them as 'parents’ would often be 'to create two conflicting parties competing for legal control of the child’ and that, in order to provide for the child’s welfare, 'it is necessary to impose upon at least one of the parties legal responsibility for the welfare of [the child], and since necessarily the female is present at the birth of the child and identifiable as the mother,’ the State has selected the unwed mother, rather than the unwed father, as the biological parent with that legal responsibility.” *580 The dissenters did not prevail in their view that (p 663) "[qjuite apart from the religious or quasi-religious connotations that marriage has—and has historically enjoyed—for a large proportion of this Nation’s citizens, it is in law an essentially contractual relationship, the parties to which have legally enforceable rights and duties, with respect both to each other and to any children born to them. Stanley and the mother of these children never entered such a relationship.”[1]
Following the Supreme Court’s decision in Stanley, it remanded two adoption cases to State courts for reconsideration in the light of Stanley (Rothstein v Lutheran Social Servs. of Wis., 405 US 1051, supra; Vanderlaan v Vanderlaan, 405 US 1051). On remand, the Supreme Court of Wisconsin in the Rothstein case held unconstitutional the Wisconsin statutes under which unmarried fathers were not accorded the same rights as were married fathers. That court wrote: "To comply with constitutional dictates and until the legislature provides a more adequate procedure, notice for the termination of the natural parental rights of unwed fathers shall be the same as that required to be given to married parents. * * * With respect to adoption by consent without formal termination of parental rights, [none of the applicable Wisconsin statutes] can be given legal effect. Consent of both the unwed mother and the unwed father, or the consent of one parent with proper termination of the parental rights of the other, is necessary.” (State ex rel. Lewis v Lutheran Social Servs., 59 Wis 2d 1, 8-9, supra.)
On remand in Valderlaan, the Appellate Court of Illinois (9 Ill App 3d 260), overriding explicit statutory proscription, awarded custody of two illegitimate sons to their unmarried father.
In particular I am unable to discern precisely the standard invoked here by the majority to test whether there has been a denial of equal protection. I would be obliged to characterize its conclusion "that the classification is reasonable, not arbitrary, and [that], keeping in mind the paramount consideration of a child’s welfare, the legislative action is justified” (supra, p 574) as little more than language of result engrafted on a rational basis test.
*581 The Supreme Court of the United States does not apply a single standard in the adjudication of cases arising under the equal protection clause; two tests stand at the extremes, and there has been movement toward what appears to be a middle ground between them. "In considering laws challenged under the Equal Protection Clause, this Court has evolved more than one test, depending upon the interest affected or the classification involved.” (Dunn v Blumstein, 405 US 330, 335; Memorial Hosp. v Maricopa County, 415 US 250, 253.) It is my understanding of the Supreme Court cases that where the "classification involved” is one deemed "suspect”[2] or where the "interest affected” by the challenged differentiation is of constitutional dimension and therefore deemed "fundamental”,[3] the Supreme Court holds that: "the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis’ for the distinctions made are not applicable.” (Kramer v Union Free School Dist., 395 US 621, 627-628 [n omitted; emphasis supplied]; Dunn v Blumstein, supra, pp 335, 337-339, 342-343, and see cases cited at p 335, n 6.)
In consideration of equal protection arguments, therefore, there is a threshold issue first explicitly to be confronted and clearly to be resolved, namely, by what standard shall the assertions of denial of equal protection be measured (cf. McDonald v Board of Election, 394 US 802, 806). I conclude that the rational basis test is inappropriate in this case, and that section 111 of our Domestic Relations Law must be subjected to a stricter standard of review.[4] Under the more demanding *582 standard of review, "rationality” plays only a minor role with respect to the constitutionality of laws affecting a fundamental interest or involving a suspect classification. Such laws are unconstitutional unless both branches of the test are met, ie., "unless the State can demonstrate that such laws are 'necessary to promote a compelling governmental interest.’ Shapiro v Thompson, [394 US 618] at 634 (first emphasis added); Kramer v Union Free School District, 395 US [621], at 627. * * * And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.” (Dunn v Blumstein, supra, pp 342-343; also San Antonio School Dist. v Rodriguez, 411 US 1, 34, n 73.)
I recognize that the categorical "two-tiered” approach has come under increasing criticism for its apparent inflexibility. (See, e.g., Gunther, n 4; and see Mr. Justice Marshall’s dissenting opinion in San Antonio School Dist. v Rodriguez, 411 US 1, 70-133, supra; prescribing a "sliding-scale” approach under which a [p 98] "spectrum of standards” should be applied according to the [p 99] "constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn”.) Under any such "sliding-scale” approach, I would conclude that the statutory provision here under attack cannot withstand the scrutiny appropriately to be undertaken—as calling in part for more than a "conceivable rational basis” yet perhaps less than proof of a "compelling state interest”. (Cf. Jimenez v Weinberger, 417 US 628; New Jersey Welfare Rights Organization v Cahill, 411 US 619; Gomez v Perez, 409 US 535; Weber v Aetna Cas. & Sur. Co., 406 US 164; Glona v American Guar. & Liab. Ins. Co., 391 US 73; Levy v Louisiana, 391 US 68. In each of these cases, the court, applying a standard much more stringent than the rational basis test yet not so demanding as the compelling State interest test, struck down statutes discriminating against those touched by illegitimacy.) Whether the State must demonstrate what has been termed "a compelling State *583 interest” to support the constitutionality of this statute or whether it will suffice to establish a lesser but nonetheless substantial governmental interest is not critical here. On my analysis it is essential in either event that the State meet the corollary test that the statutory scheme employed was the least restrictive appropriate to the objective sought.
In my view the interests here affected by the challenged law —the rights of a natural father with respect to his own child —are fundamental and thus entitled to a higher level of constitutional protection. A statute providing for unequal treatment of those interests, i.e., differentiating between married and unmarried fathers, can only be sustained on a demonstration that it meets a strict scrutiny test.[5] I recognize the difficulty in some cases of determining exactly which rights and interests are to be held fundamental, infringement of which requires application of the strict scrutiny standard. The Supreme Court in San Antonio School Dist. v Rodriguez (411 US 1, 31, supra) (determining that the right to education is not fundamental in the constitutional sense), quoted from Mr. Justice Stewart’s concurring opinion in Shapiro v Thompson (394 US 618, 642, supra): "The Court today does not 'pick out particular human activities, characterize them as "fundamental,” and give them added protection’ * * * To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.” The San Antonio court made clear that whether a right or interest is to be held to be fundamental turns on whether such right is (pp 33-34) "explicitly or implicitly guaranteed by the Constitution.” That classification of a right as fundamental can turn on implicit constitutional recognition has been borne out in a *584 number of cases.[6]
My conclusion that a natural father’s rights and interest in his own child are implicitly recognized and protected by the Constitution stems from my conception of the basic civil rights of man—rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental” (Snyder v Massachusetts, 291 US 97, 105) and which may be said to have been incorporated into the Constitution (cf. Griswold v Connecticut, supra, passim). While the Stanley court (405 US 645, 651, supra) did not expressly label the right of the natural father there as "fundamental”, the language of the court in my view fairly permits no other inference:
"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.’ * * *
"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one’s children have been deemed 'essential,’ * * * 'basic civil rights of man’ * * * and '[r]ights far more precious * * * than property rights’ ”. (Emphasis added.) Compare Cleaver v Wilcox (40 US Law Week 2658 [US Dist Ct, ND Cal], revd in part on other grounds 499 F2d 940) wherein it was stated (p 2659): "The parent’s interest in the liberty of the child, in his care and in his control, has long been recognized as a fundamental interest.”
*585 Our State courts have long recognized that "[t]he relationship between minor children and their natural parents is jealously guarded” (Matter of Susan W. v Talbot G., 34 NY2d 76, 80); that "[a] parent’s concern for the liberty of the child, as well as for his care and control” is a "fundamental * * * interest and right” (Matter of Ella B., 30 NY2d 352, 356); and that in adoption and custody contests between natural parents and nonparents the primacy of parental rights may not be ignored "since the right of a parent * * * to establish a home and bring up children is a fundamental one and beyond the reach of any court” (People ex rel. Kropp v Shepsky, 305 NY 465, 468; cf. People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185; People ex rel. Anonymous v Anonymous, 10 NY2d 332, 335; People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d 122, affd 12 NY2d 863; Matter of Three "John” Children, 61 Misc 2d 347, 363). I view these decisions as giving meaning and recognition to one of the most basic interests common to all mankind—the concern of a natural parent for his or her own child. I can conceive of no more important or substantial interest which should be entitled to a greater degree of constitutional protection.
There is discrimination here as to a fundamental right and I conclude, therefore, that the strict scrutiny test is applicable. Thus I depart from the "rational basis” test apparently adopted by the majority.
On my analysis attention must then turn to whether the statutory differentiation here meets the demands of that higher level of scrutiny—i.e., both that it is warranted by a compelling governmental interest and that the means employed are the least restrictive.
Very much the same considerations which lead me to the conclusion that the rights of a natural father with respect to his own child are so fundamental and constitutionally cognizable as to call for application of the strict scrutiny test, lead me to conclude that the interests of the State in the welfare of illegitimate children are so compelling as, without more, to satisfy the first branch of the strict scrutiny test. Historically the State has been recognized as having an overarching interest in the care and well-being of all its children. I would require no more to establish the requisite "compelling state interest”.
My conclusion that the challenged provisions of section 111 should be struck down under the equal protection clause is *586 predicated, however, not on any assertion that there is no compelling State interest, but rather on the ground that this statutory scheme fails to satisfy the second branch of the strict scrutiny test—namely, that there were no "reasonable ways to achieve those goals with a lesser burden on the constitutionally protected [interests]” (Dunn v Blumstein, 405 US 330, 343 supra). The critical question, then, is whether short of the categorical denial of the rights of all unmarried fathers, the Legislature could not have fashioned less restrictive and more appropriate means to achieve the desired protection of illegitimate children. In pursuing a concededly compelling interest, "the State cannot choose means that unnecessarily burden or restrict constitutionally protected [rights]” (Dunn v Blumstein, supra, p 343).
There has really been no focus on this branch of the test, nor does the majority now undertake to do so. No contention has been advanced by those who would support the present provisions of section 111, that resort to its blunderbuss approach was necessary to achieve the desired objective, or that such objective could not have been achieved less drastically and without the overbreadth of the present provisions. The constitutional infirmity in the present statute, in my view, stems from its categorical exclusion of all unmarried fathers. As the court wrote in Stanley (405 US 645, 654-655, supra): "It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children. This much the State readily concedes, and nothing in this record indicates that Stanley is or has been a neglectful father who has not caréd for his children. Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring. Had this been so, the State’s statutory policy would have been furthered by leaving custody in him.” By parallel reasoning in Carrington v Rash (380 US 89), the court had struck down a Texas statute which denied the right to vote to all servicemen for the asserted purpose of restricting the electorate to bona fide residents. In drawing support from Carrington, the Stanley court noted (p 655): "There we recognized that Texas had a powerful interest in restricting its electorate to bona fide residents. It was not disputed that most servicemen stationed in Texas had no *587 intention of remaining in the State; most therefore could be deprived of a vote in state affairs. But we refused to tolerate a blanket exclusion depriving all servicemen of the vote, when some servicemen clearly were bona fide residents and when 'more precise tests, ’ id., at 95, were available to distinguish members of this latter group. 'By forbidding a soldier ever to controvert the presumption of non-residence,’ id., at 96, the State, we said, unjustifiably effected a substantial deprivation. It viewed people one-dimensionally (as servicemen) when a finer perception could readily have been achieved by assessing a serviceman’s claim to residency on an individualized basis.” (Emphasis supplied.)
I am satisfied that more appropriate and selective procedures could have been found to satisfy the compelling State interest. (See Comment, The Emerging Constitutional Protection of the Putative Father’s Parental Rights, 70 Mich L Rev 1581, 1590.) For instance several States have adopted legislation authorizing the adoption court on an ad hoc basis in individual cases to dispense with the requirement of consent of a parent—father or mother, married or unmarried—when there has been an appropriate finding that insistence on such consent would not be in the best interests of the child (see, e.g., Ariz Rev Stat Ann., § 8-103 et seq.; DC Code, § 16-304, subd [e]; Md Code Ann., art 16, § 74; Va Code, § 63.1-225, subds [2], [4]). Under the Arizona statute the right of consent is extended to the father of an illegitimate child where paternity has been established in court or where he has acknowledged paternity in a sworn affidavit filed either with a court or the adoption agency prior to or at the time of the filing of the petition for adoption. The statute authorizes the court to "waive” the consent right if it determines that the best interests of the child will be promoted thereby. This waiver provision applies to maternal as well as to paternal consent. (See Tabler, Paternal Rights in the Illegitimate Child: Some Legitimate Complaints on Behalf of the Unwed Father, 11 Journal of Family Law 231, 245-247.) Such a statutory pattern, and there are doubtless others, would meet the test laid down by the Supreme Court: "in other words, the classification must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal.” (Kramer v Union Free School Dist., 395 US 621, 632.) In my view, the sweeping approach of the present statute is not sufficiently "tailored” to pass constitutional muster; the denial *588 of the rights of this loving, attentive and faithful father is not necessary or even desirable to the realization of the State’s goal.
I conclude that the State has not met its “heavy burden of justification” (Dunn v Blumstein, supra, p 343) and, therefore, that section 111 of our Domestic Relations Law must be held unconstitutional to the extent that it authorizes adoption without the consent of the father of a child born out of wedlock while at the same time it categorically forbids adoption without consent on the part of the father of a child born in wedlock.
I recognize that the position of the Supreme Court (and what, in my view, should be that of our court) may strike some as startling in the light of the difference our society has traditionally attached to birth in wedlock as distinguished from birth out of wedlock. I note, however, that when viewing the father-child relationship from the point of view of the child, the Supreme Court has long held that an illegitimate child is entitled to precisely the same rights as a legitimate child (Jimenez v Weinberger, 417 US 628, supra [disability benefits under the Social Security Act]; New Jersey Welfare Rights Organization v Cahill, 411 US 619, supra [welfare benefits]; Gomez v Perez, 409 US 535, supra [parental support]; Weber v Aetna Cas. & Sur. Co., 406 US 164, supra [workmen’s compensation benefits]; Levy v Louisiana, 391 US 68, supra; Glona v American Guar. Co., 391 US 73, supra [wrongful death actions]).
Further, the practical implications of the decision which I think we are mandated to make would not be so disturbing as might at first appear.[7] It would be my understanding that the fact of unmarried fatherhood would have to be established as a threshold prerequisite, presumably by the terms of a proper *589 order of filiation. In any event, as stated above, notice and an opportunity to appear would have to be granted; hence practical problems incident thereto would not be exacerbated by requiring the consent of such father or in the alternative a determination that his consent was not required. Quite aside from the enactment of any precisely focused legislation of the sort referred to above, I point out that appropriate provision has already been made by our Legislature effectively to counter most of the disturbing consequences foreseen by the majority if all fathers were to be accorded equal rights. The statute now provides that the right-to-consent of a married father or of a married or unmarried mother can be terminated on proof of any of the several disqualifications expressly set forth in the grammatical paragraph following subdivision 4 of present section 111 of the Domestic Relations Law, including notably abandonment, surrender, deprivation of custody of the child, deprivation of civil rights or adjudication of incapacity. In my view these protective provisions would automatically be extended to embrace the rights of an unmarried father as well.
To the extent that there is not already adequate provision in the present statute to protect against what are visualized and catalogued by the majority as the horrors which would attend a determination of unconstitutionality in this case, it is open to our Legislature to consider statutory amendment specifically to authorize dispensing in any particular case with the necessity for the consent of any parent, married or unmarried, father or mother.
In substance I conclude that the Supreme Court has held that the rights between a parent and his child are not to be determined by whether or not they agree to marry. Thus, the divorced and long-separated father, because once there was a marriage, shall not be recognized as having rights substantially greater than those of a natural father who has never been married.
Although a general principle of law, and perhaps particularly of family law, must, of course, be grounded in more than the appealing facts of an individual case, the factual setting of the present case should not be wholly ignored.
This man and this woman began living together as husband and wife in February,. 1969. They continued to do so for more than two years after the birth of their daughter in November, 1970. When it became known early in 1970 that the woman was pregnant, the man proposed marriage but the woman *590 refused. When the child was born on November 16, 1970 the man’s name was listed on the birth certificate as the father. He has never denied paternity; he paid all expenses of the child’s birth and rearing.
The father, mother, and daughter continued to live together as a family unit until June, 1972 when the mother forced the father out of their apartment. The father nonetheless continued to pay the apartment rent. When the mother instituted a formal paternity suit in August, 1972, the father promptly appeared and readily admitted paternity. An order of filiation was entered on September 8, 1972, and the father thereafter regularly made support payments in the amount of $150 per month as directed by the terms of such order. He continued to exercise rights of visitation granted to him therein. He made numerous appointments for family counseling in the period from September, 1972 to February, 1973; the mother appeared but once. In January, 1973 the mother began returning his support payments; she moved to a new address, took the child with her, and refused the father rights of visitation.
On April 12, 1973 at a hearing in a proceeding instituted by the father in Family Court to enforce his rights of visitation, the mother announced that she had been married the preceding February and her new husband wanted to adopt the child. The adoption proceeding was instituted. Family Court directed that notice be given the father, and he appeared and opposed the adoption. The present direct appeal is from the order of adoption of Family Court in which it was held that the consent of the natural father was not a condition precedent to adoption.
In short this record discloses the existence of a genuine family unit into which this child was born and in which she was reared until removed by unilateral action of the mother. The full and attentive participation and commitment of this father both emotionally and in provision of material care is movingly disclosed. It is true that the parents were never formally married, but the vitality of this family unit for many months paralleled and exceeded the vitality which follows many solemnized marriages.
In my view the order of Family Court, Westchester County, should be reversed, section 111 declared unconstitutional to the extent indicated, and the petition for adoption denied unless the natural father of the child shall consent thereto or *591 his rights shall have been terminated for disqualification specified in section 111.

. In Levy v Louisiana (391 US 68, 71) the Supreme Court stated that "when it comes to basic civil rights [we] * * * have not hesitated to strike down an invidious classification even though it had history and tradition on its side.”

. Those classifications considered "suspect” in the constitutional sense include race (see, e.g., Loving v Virginia, 388 US 1; McLaughlin v Florida, 379 US 184); national origin (Hernandez v Texas, 347 US 475; Oyama v California, 332 US 633); alienage (Matter of Griffiths, 413 US 717; Graham v Richardson, 403 US 365); and possibly sex (Frontiero v Richardson, 411 US 677; cf. Stanton v Stanton, 421 US 7). The character traits of these suspect classifications appear to share a common element—"an immutable characteristic determined solely by the accident of birth” (Frontiero v Richardson, supra, p 686).

. Those interests identified as "fundamental” in the constitutional sense include the right to vote (Dunn v Blumstein, supra; Kramer v Union Free School Dist., 395 US 621); the right to travel (Shapiro v Thompson, 394 US 618); the right to procreate (Skinner v Oklahoma, 316 US 535); the rights of criminal defendants (Williams v Illinois, 399 US 235; Griffin v Illinois, 351 US 12), and the rights to enjoy personal privacy (Eisenstadt v Baird, 405 US 438, 447, n 7).

. For an analysis of this "two-tiered” approach see, generally, Gunther, The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection (86 Harv L Rev 1); Comment, Equal *582 Protection in Transition: An Analysis and a Proposal (41 Fordham L Rev 605). For consideration of the two-tiered approach as applied to illegitimacy cases see Comment, Illegitimacy and Equal Protection (49 NYU L Rev 479); Comment, The Emerging Constitutional Protection of the Putative Father’s Parental Rights (70 Mich L Rev 1581).

. Appellants argue that the strict scrutiny standard of review is here mandated not only because the challenged statute interferes with a fundamental right but further because it makes a classification in two "suspect” categories—first, sex (as between the natural mother and the natural father of the illegitimate child), and second, illegitimacy (as between the father of an illegitimate child and the father of a legitimate child). While I find these arguments relevant and interesting, according to my reading, to date only four Justices of the Supreme Court have concluded that sexual discrimination involves a "suspect classification” (see Frontiero v Richardson, 411 US 677, supra; and see concurring opinion of Powell, J., p 691; see, also, Stanton v Stanton, 421 US 7, supra), and no opinion yet holds that "illegitimacy” constitutes a suspect category. In fact the Supreme Court has expressly declined to reach the latter issue (see Jimenez v Weinberger, 417 US 628, 631-632, supra; cf. Norton v Weinberger, 390 F Supp 1084).

. While Skinner v Oklahoma (316 US 535), found fundamental the right to procreate and applied the strict scrutiny standard to a State statute impinging on such right, the Constitution clearly makes no mention of any right to procreate. While Griswold v Connecticut (381 US 479), recognized "fundamental freedoms” certainly not explicitly recognized in the Constitution, the Supreme Court has noted that if a statute "impinges upon fundamental freedoms under Griswold * * *, the statutory classification would have to be not merely rationally related to a valid public purpose but necessary to the achievement of a compelling state interest.” (San Antonio School Dist. v Rodreguez, supra, p 34, n 73, quoting from Eisenstadt v Baird, 405 US 438, 447, n 7 [emphasis in original]). Notwithstanding that "the right to vote in state elections is nowhere expressly mentioned [in the Constitution]” (Harper v Virginia Bd. of Elections, 383 US 663, 665), "this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.” (San Antonio School Dist. v Rodriguez, supra, p 34 n 74, quoting Dunn v Blumstein, supra, p 336 [emphasis in original]).

. For an expression of anxiety see, e.g., Fathers’ Rights—Supreme Court Rulings On Adoption Complicate the Placing of Children, Wall Street Journal, July 9, 1973 (col 1). Even if it were to be conceded, which I am not prepared to do, that striking down the challenged provisions of section 111 would necessarily cause some disarray or more in adoption matters, the result should not be different. In People ex rel. Anonymous v New York Foundling Hosp. (17 AD2d 122, affd 12 NY2d 863, supra), the court was confronted with the contention that recognition of the rights of a natural mother should be expected to cause inconvenience or frustration to authorized agencies in the placement of children. This argument was dismissed as (p 125) "not a sufficient counterweight. The fact of relationship between a natural parent and child ought not to be subordinated to such considerations, important as they are.” (See, also, People ex rel. Kropp v Shepsky, 305 NY 465, 468-469, supra.)