Allan Dixon, J.
This custody proceeding, brought by the natural mother of the minor child is before the Family Court, Rensselaer County on a petition and order to show cause initiated in this court under subdivision (7) of section 358-a of the Social Services Law. Jurisdiction is vested in Family Court for this purpose under subdivision (b) of section 651 of the Family Court Act. Petitioner, pursuant to a written surrender agreement dated May 28, 1974, temporarily and for an indefinite period of time surrendered custody of her daughter, K, to the Rensselaer County Commissioner of Social Services for placement in foster care. Placement was completed June 25, 1974. The reason for placement was K’s behavioral difficulties which were caused in part by K blaming her mother for her father’s death by cancer in 1971, since K felt her mother had not given her father proper care. As a result, K began to withdraw into herself, would not return from school on time, her school grades declined noticeably, and she did not want to attend school. K, then age 12, was bed wetting, having temper tantrums, and she was experiencing recurring nightmares. She started to return home later than 9:00 p.m. and would not mind her mother. Also, there were two episodes of alleged self-destruction. On one occasion K cut her finger in front of her mother, and on the other K was said to have deliberately run in front of an oncoming truck.
K is the youngest of four children, the ages being 35, 33, 26, and 13. She has a good relationship with her eldest brother, who is married and lives with his family in Connecticut. Prior to her placement in foster care, K made periodic visits at his home.
On a request by this court, Dr. Carl Mindell, the supervising child psychiatrist with the Pawling Center of the Rensselaer County Mental Health Board, conducted individual interviews with K, her mother, and the foster mother. His recommendations were in response to the question whether K should remain in her present foster home placement of over one year or whether she should return to her mother. (Previously, around June, 1964, the Pawling Center had recommended that K be placed in a foster home.) Relying on these psychiat *889 ric examinations and a review of the records, he found and expressed the following current conditions in a written report to this court: As regards K, she has developed ties to her present foster family, she is now obtaining A’s and B’s in her school work, and she has a good attendance record at school. K’s strong preference is to stay in tier present foster home placement "because she feels ttiere that she is considered to be a person, 'I’m a part of the family, I’m counted as someone like the other people in the family.’” (Psychiatrist’s report, p 2.) K’s mother will not allow K to sleep in her own room, but rather requires K to sleep in her (K’s mother’s) bed, and K feels her mother needs K as a companion. K also said, that during her stay at the foster home she has become closer to the other members of her family, especially James. K is no longer bed wetting nor having recurring nightmares. She can talk when she becomes angry now, rather than having temper tantrums. There have been no episodes of self-destruction since her foster home placement.
Dr. Mindell’s findings were that K5 has "made giant strides in getting over behavioral difficulties” (Psychiatrist’s report, p 4) which she had upon entering the foster home, and she "seems to be developing within normal limits for a 13 year old with possibly some difficulties in the area of making friends.” (Psychiatrist’s report, p 4.) Dr. Mindell found K to be receiving adequate parenting in her present foster home; "namely, that she is receiving adequate nurturance and support protection, and certainly continuity of care.” (Psychiatrist’s report, p 4.) Dr. Mindell recommended, and similarly testified at the hearing, that it would be in K’s best interests for her to remain where she is in the foster home. "In my opinion, to remain in the [foster] home is certainly the least detrimental alternative available.” (Psychiatrist’s report, p 4.) Dr. Mindell testified that although K’s mother was interested in K, in her capacity as a mother, K’s mother had trouble differentiating between her needs and her child’s needs, and consequently erred much more toward her own self-interests.
K’s strong and marked preference is to stay in the foster home for two reasons: she feels that her mother wants her solely for a companion; and she feels that her present foster parents like her as a person and are able to view her as a child they love. Dr. Mindell confirms the former in his statement that "K, however, senses that her mother’s wishes have more to do with her mother’s needs than with K’s needs. *890 (Psychiatrist’s report, p 4.) Dr. Mindell further testified that if K expressed an interest in living with her brother in Connecticut, the biological ties should be strengthened with periodic visits over a period of time. At a later time the situation should be examined to determine whether this would be a good placement. Also, Dr. Mindell stated that the eldest brother would need to show his capacity and interest in being a parent to K.
The general rule in New York in custody contests between parent and nonparent is that the parent’s right to the custody of the child is superior to that of any third person. (People ex rel. Anonymous v Anonymous, 10 NY2d 332, 335; People ex rel. Kropp v Shepsky, 305 NY 465, 469.) The Court of Appeals has held (p 469) that even where the nonparent acquired custody initially by the parent’s consent, "[e]xcept where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship, or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s welfare compels awarding its custody to the non-parent.”
In another case where the custody contest was between mother and grandmother, the long-standing principle was stated thusly: "No court can, for any but the gravest reasons, transfer a child from its natural parent to any other person (People ex rel. Boulware v Martens, 232 App. Div. 258, affd 258 N. Y. 534; People ex rel. Hausler v Stegmeier, 240 App. Div. 901, affd 264 N. Y. 483; Matter of Thorne, 240 N. Y. 444; Domestic Relations Law, § 81), since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court (Meyer v Nebraska, 262 U. S. 399).” (People ex rel. Portnoy v Strasser, 303 NY 539, 542.)
But while the fact of parentage carries a presumptive strength that must be overcome to deny the parent custody of the child, it has been held that once the natural parent has terminated custody, this presumption loses much of its strength. (People ex rel. Grament v Free Synagogue Child Adoption Comm., 194 Misc 332.) Whether this principle is valid in cases of temporary surrender, like the instant case, is still an open question.
Anóther and sometimes countervailing consideration is that the Judge acts "as parens patriae to do what is best for the *891 interest of the child.” (Findlay v Findlay, 240 NY 429, 433.) But the best interests of the child are presumed to be identical with the right of the parent, as against nonparent, to have custody of the child and to raise the child, "but this presumption fails when it is proved that the parent has abandoned the child or is not fit to rear him.” (People ex rel. Anonymous v Anonymous, 10 NY2d 332, 335, supra.)
The psychological well-being of the child has been posited as being far more important to the child’s welfare than his physical or material welfare. (73 Yale LJ 151, 157.) Psychological parenthood, or the adult and child mutual interaction in terms of basic trust, love, confidence, and affection, is a prerequisite to normal child development. When the child has adopted a third party as his psychological parent after a period of separation from his biological parent, "Any prior relationship with the biological parent may deteriorate to the point where it is not only supplanted, but also incapable of resusitation. Where this has happened, a change in custody based solely on biological relationship might, by disrupting the existing relationship of psychological parenthood, work considerable emotional harm upon the child; it could even cause him to refuse to enter a new relationship.” (73 Yale LJ, supra, pp 158-159.) In chambers, K’s very strong and emphatic articulated preference was to remain in her present foster home. Her choice should be given some weight and credence, since a child of ISV2 has capacity to make an intelligent decision. She is not presently weighted down with anxiety or depression, and she is well past the age of tender years.
If a child’s physical condition is such that sudden removal from nonparent and placement with the natural parent would probably endanger its emotional or physical welfare and health, the courts are not prone to do so. (15 NY Jur, Domestic Relations, § 364; People ex rel. Chuz v Reiter, 282 App Div 932.) This court finds that K’s emotional well-being would be detrimentally affected if she were returned to her mother’s custody at the present time. K has overcome the emotional and psychological problems she had while with her mother; K no longer wets her bed, has temper tantrums, nor has recurring nightmares. In my opinion, a transfer to her mother’s custody might easily cause a renewal of these problems.
In a case where an unwed mother of an illegitimate child sought the child’s return from foster parents, where surrender was for adoption, Mr. Justice, now Chief Judge Breitel voiced *892 the court’s opinion in this language: "Perhaps the most significant factor to be considered in cases of this kind is the motivation of the mother in seeking return of the child. It is recognized that very often there is a substantial risk of improper motivation. In such case the authorized agency and the court must be especially alert not to permit the improper motivation to endanger the interests of the child or lead to any other noxious consequence. * * * Considering the record in this case, there is enough to cast grave doubt on whether relator has so stabilized her own relationships or become so stable in her own mind to suggest the return of the child to her. Since, especially with the passage of time, the interests of the child would be seriously and increasingly jeopardized by return, the petition was properly dismissed.” (People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d 122, 125-126, affd 12 NY2d 863; emphasis supplied.) K’s mother is 57, alone in a large house, and admittedly lonely. The motivation for having K returned to her mother’s custody is merely to provide companionship to the mother and not for K’s best interests.
K’s interests and welfare are not identical with her mother’s welfare and interests. K’s mother is unsuitable and unsatisfactory as a parent, since she wants K only to satisfy her own loneliness and at K’s emotional, mental and physical expense. It is uncertain whether K could adjust to such a radical change in environment. K’s emphatic preference is to remain where she is, at all costs. In terms of probability, K would probably regress to her former behavioral and emotional difficulties if put in her mother’s custody. In a case such as this, the presumption that the parent’s right to custody as against nonparents is overcome by finding the parent not fit to have such custody, and the best interests of the child dictate that the child remain in her current foster home placement.
K’s mother should continue to have reasonable visitation rights at reasonable hours of the day. Thus, it is ordered that she be allowed to visit K at the foster home, or remove K from the foster home for visitation purposes, on either Saturdays or Sundays between the hours of 9:00 a.m. and 5:00 p.m. Further, since K expressed closeness to her eldest brother, and a desire to eventually live with him and his family, the Social Services Department shall arrange visits at his home during the vacation periods of the current school year to strengthen the biological ties, with a long-range plan for K to reside with him *893 at the end of the school year if such placement is then found appropriate.
The petition by the mother under section 358-a of the Social Services Law is hereby dismissed.