THE PEOPLE OF THE STATE OF NEW YORK ex rel. THEODORE R. OSBORNE et al., Respondents, against PAULINE C. H. HAYES et al., Appellants.

Third Department, May 19, 1954.

*Murray L. Pernell* for appellants.

*John M. Rennell* for respondents.

*Per Curiam.* Myrtle Lee Hardiman was born to the defendant, Pauline Craft Hardiman (Hayes), and her husband, John Hardiman, April 15, 1943. On March 24, 1951, she was adopted as an abandoned child by relators, Theodore Roosevelt Osborne and Mary Catherine Osborne, of Quinwood, West Virginia, by virtue of a decree of the Circuit Court of Greenbrier County, West Virginia, which awarded them custody of the child and changed her name to Myrtle Lee Osborne. Constructive notice of the adoption proceeding was given by publication in a newspaper of general circulation in the county of residence of the Osbornes and the child. On December 2, 1953, defendant, Pauline Hayes, and codefendant, her present husband, without the knowledge of relators, picked Myrtle up at Quinwood and took her to their home at Endwell, New York, where she remains.

Asserting their rights under the decree of adoption, relators obtained a writ of habeas corpus in this State, returnable before Broome County Special Term of the Supreme Court, to determine the custody of the infant. Defendants' return challenged the adoption decree on the grounds that the mother had not abandoned her daughter, that she received no notice of the adoption proceeding prior to the entry of the decree, and that such decree was obtained through fraud and misrepresentation on the part of relators. The issues raised by the return were heard by the court at Special Term, where decision was rendered in favor of relators and an order made sustaining the writ and awarding custody and possession of the child to relators as her parents by adoption, from which this appeal is taken.

Mary Catherine Osborne, relator, is an aunt of said John Hardiman. In 1943, the Hardimans and their four children lived at Leslie, near Quinwood. When Myrtle was two or three months of age, the mother left her husband when he threatened to beat her, sending the children to the Osborne home and going to Charleston, West Virginia, for three or four weeks. After a reconciliation, which proved to be of brief duration, the parents

moved with their children to Charmco, West Virginia. Another quarrel ensued and defendant mother took the four children to the home of her father at White Sulphur Springs, West Virginia. Some weeks later she took this child to another aunt, Bertha Mullens, at Allegheny, West Virginia, telling Mrs. Mullens that she would pay for the baby's support. When such support was not paid, Mrs. Mullens communicated with the Quinwood relatives and sent the child to the Osbornes in early 1944, where she remained until taken by defendants last December.

The court below correctly appraised the legal aspects of this proceeding. The West Virginia decree is entitled to full faith and credit unless shown to have been obtained by fraud or that the court lacked jurisdiction (*Kerr* v. *Kerr,* 41 N. Y. 272, 275; *Hunt* v. *Hunt,* 72 N. Y. 217 225; *Scanlon* v. *Kuehn,* 225 App. Div. 256, 258, 259), though the burden of proof of such fraud or lack of jurisdiction falls upon the one raising the defense.

It is uncontested that the West Virginia statutes concerning adoption are similar to ours in that the consent of a parent who has abandoned a child is not necessary and that neither statute requires notice to such a parent in order that he or she may be heard on the question of abandonment. However, in the absence of notice, either actual or constructive, an adjudication of abandonment cannot be conclusive against the parent who may attack it. (*People ex rel. Pickle* v. *Pickle,* 215 App. Div. 38, 44.) Having accorded defendants the right to attack the West Virginia decree, the court determined that they had failed to show that the West Virginia adjudication of abandonment was erroneously made.

The testimony bearing on the existence of an abandonment by the mother of her child was extensive, somewhat confusing at times, and occasionally contradictory. Detailed references to it would unnecessarily prolong this statement. This child was less than nine months of age when her mother left her with Bertha Mullens, prior to the time she was finally transferred to the Osbornes. The next occasion when the mother saw her was April 15, 1945, her second birthday. On two occasions in 1949 the mother was in the vicinity of Quinwood, primarily on other matters, and saw her daughter. She met her present husband in Washington, D. C., and married him in 1950. In that year they visited her married daughter Lucille at Charmco, about eight miles from Quinwood, for a period of approximately three weeks, during which time the mother again saw her child. She and her husband were in the vicinity of Quinwood in 1951 subse-

quent to the adoption, of which she had learned. There was then some inconclusive conversation with Mrs. Osborne on the subject of the child and its adoption. No request was then made by the mother for the return of her daughter, nor did she then or at any other time attempt to void the adoption in the West Virginia court.

On the evidence before it the court has found that at no time, except on the rare occasions above mentioned and with no substantial impediment shown, did the mother make any effort to contact or see the child, sending her no cards, letters, birthday or Christmas gifts, or exhibiting any other such evidence of continued parental love and affection. It was also found that she made no effort whatever to contribute anything directly to the Osbornes for the support of her child and gave no indication to them that she wanted the child or expected her to be returned eventually.

The defense of fraud relates to representations and testimony by the Osbornes to the West Virginia court to the effect that Myrtle was an abandoned child and that the address of her mother was and had been unknown to them. As the court below indicated, there were inconsistencies between their testimony in this proceeding and that in the adoption proceeding, but there was no proof of fraudulent allegations and representations, designed and intended to mislead, with knowledge of falsity, and resulting in damaging deception. (*Hunt* v. *Hunt, supra,* p. 227.) Proof of fraud is wanting if the evidence is of such a nature as to leave room for an inference of honest intent. While the Osbornes do not appear to have exhausted every possible effort to ascertain the whereabouts of the mother, they did make some inquiry from members of the family who might know, and received no definite information in this regard. The frequent changes of residence of the mother, already alluded to, would have made it difficult to keep track of her. In any event it should be noted that, although the opportunity was not lacking, she failed to submit her claim of fraud to the court upon which she asserts it was practiced.

The practical and real fact is that this mother left her daughter in the hands of these relators for nearly ten years. They reared the child from babyhood and provided her with a home and security for that period of time. Abandonment does not necessarily imply that a parent has deserted a child, or even ceased to feel any concern for its interests (*Matter of Davis,* 142 Misc. 681, 691, citing *Winans* v. *Luppie,* 47 N. J. Eq. 302), but is simply

the evidentiary fact demonstrating the relinquishment of one's rights. (1 Words and Phrases [Perm. ed.], p. 6, citing *Nugent* v. *Powell*, 4 Wyo. 173.) The findings of the court below are amply supported by the record.

The order should be affirmed, without costs.

FOSTER, P. J., BERGAN, COON, HALPERN and IMRIE, JJ., concur.

Order affirmed, without costs. [See 283 App. Div. 1121.]