Fuld, J.
Shortly after his birth in 1953, the infant Maxwell was turned over to the respondents with the consent of the appellant, his natural mother, and since that time the respondents have had his care and custody. Sometime in 1954, they petitioned to acquire his permanent custody by adoption. After a hearing, at which the appellant appeared in opposition, the County Court of Erie County made an order, dated July 20, 1956, approving and granting the adoption. On appeal, the Appellate Division, by an order entered in November of 1957, unanimously affirmed the trial judge’s determination and the finding of facts which he had made.
This is not a case where the mother surrendered the baby after birth on the spur of the moment or without having given thought to the matter. On the contrary, what she did was planned, the product of deliberate consideration. Separated from her husband since 1950, she had, while living with him, six children. Of these six children, only one, a young daughter, was living with her in Canada in 1953. The others, apparently taken from her by the Canadian authorities, were being cared for either by private families or in public institutions. In 1953, the appellant engaged in an adulterous course of conduct with a man by the name of Jones. The child here involved is the fruit of that illicit relationship. The appellant was most intent on keeping her pregnancy, and her wrongdoing, a secret lest, if it became known, the daughter still with her would also be taken away. In order to conceal the situation, she went from her home in Canada in July of 1953 to Buffalo, *432 where she selected an obstetrician to attend her upon the delivery of the child. She told him in no uncertain terms that she “ did not want ” the baby and expressly asked him whether he would be able to “place it any place.” He indicated that he would make the necessary arrangements, and had her return for periodic monthly examinations on four occasions. A boy baby was born on November 15, 1953 in the Buffalo General Hospital and five days later the appellant’s paramour came to the hospital and accompanied her back to Canada.
The matter of having the baby adopted was discussed by the appellant, who had given a false name and a false address, not only with the physician but also with the nurse who had attended her at the hospital. And, several hours after the baby was born, she signed an affidavit, prepared by the attorney for the respondents, in which she stated that she consented that the infant be adopted by the respondents. In addition, she declared that she “ does not at the present time embrace any religious faith.” Her assertion at the trial that she told the doctor and the lawyer that she was a Catholic was denied by each of them, and the nurse testified that the appellant stated that “ she went to no church at this time ”, although, the nurse went on to say, she understood from her conversation that the appellant had been “brought up a Catholic”.
After leaving the hospital and her baby, the appellant, as already noted, returned to Canada with Jones and not a word was heard from her until the attorney for the respondents communicated with her, asking her to appear in the adoption proceedings. The child was then almost a year old.
It is the appellant’s claim- that she is of Catholic faith and that she had not known that the persons to whom the baby had been given were Protestants. However, when, about a year after the infant’s birth, she saw the attorney for the respondents and was informed that the child was not in a Catholic home, she told him in so many words that she had no objection to that. Some time later, though, she stated, and repeated in court, that she wanted the child returned to her and that, in any event, she desired him to be brought up in the Catholic faith. Regarding the affidavit in which she declared that she did not then embrace any religious faith, she testified that she had not read that document and did not know its contents.
*433 The trial judge disbelieved her. He found not only that she had deliberately abandoned the child, but that her affidavit was her free and voluntary act and that she knew full well what she was signing. He granted the order of adoption, giving-custody of the child to the respondents, who agreed to have him baptized in the Catholic faith and educated in a Catholic elementary and high school, and the Appellate Division unanimously affirmed.
The appellant attacks the adoption on two grounds. She contends, first, that she had not given the consent required of her by the Domestic Relations Law and, second, that the foster parents were not, as required by the Social Welfare Law, of the same religious faith as that of the child.
Section 111 of the Domestic Relations Law calls for the consent of the mother to the adoption of a child born out of wedlock except, the statute recites, that such consent “ shall not be required of a parent who had abandoned the child * * * or who has been divorced because of his or her adultery ’ ’. Although the appellant was concededly guilty of adultery, she has not been divorced and, accordingly, we concern ourselves solely with the portion of the statute dealing with abandonment.
The mother did not, it is true, leave her child on a doorstep, but surely an abandonment may be established by proof of conduct less drastic than that. Just as plainly, a settled purpose to be rid of all parental obligations and to forego all parental rights spells out abandonment under section 111. When the appellant asserted that she did not want the baby and that she “ wanted ” to be done with the matter “ as quickly as possible,” when she did everything she could to conceal the child’s very birth, and herself hid behind a false name, and when thereafter she returned to Canada and for almost a year manifested not the slightest interest in the welfare of the child, his well-being or even his continued existence, she was guilty of conduct that amounted to the abandonment found by the courts below. It was, in short, the appellant’s callous disregard for the child, her complete indifference to how he was faring, not her signing of the surrender and consent document (as is suggested), that constituted the abandonment, which permits the courts to dispense with her consent.
*434 Subdivision 3 of section 373 of the Social Welfare Law, about which the second contention revolves, provides that, ‘ ‘ in granting orders of adoption, the court shall, when practicable, * * * give custody * * * only to * * * persons of the same religious faith as that of the child.” The words “ when practicable ” are significant and may not be construed or read out of the statute.
It is, of course, the settled policy of this state to insist upon adoption by persons of the same religious faith as that of the child. But this policy does not require a court to deny custody to adoptive parents where a child has been accepted by them following a declaration or representation by the mother, which may or may not be true, that she does not embrace any religious faith. (See Matter of Krenkel, 278 App. Div. 573, adoption to persons of different religious persuasion approved, where mother falsely stated her own religious faith to be that of the foster parents.) If the rule were otherwise, the foster parents would ever run the risk of not being able to adopt the child, and the child ever subjected to the danger of having attachments formed painfully severed, for how may it be known that the natural mother has not lied about her religious affiliation ?
Section 373 of the Social Welfare Law contains no absolute requirement that the faith of the foster parents be that of the child. The statute calls upon the court to give custody to persons of the same religious faith as that of the child “ when practicable.” That term is of broad content, necessarily designed to accord the trial judge a discretion to approve as adoptive parents persons of a faith different from the child’s in exceptional situations. Had the legislature intended that in every case the child be adopted by persons of its own religious faith, it obviously would have made its design known by language far different from that which it used. The presence in the statute of the words “ when practicable ” was to enable the court to relax the requirement in the unusual case such as the one before us.
The statute may not be employed as a means of wiping out a relationship between foster parents and child which originated in good faith and has continued for the entire four and a half years of the youngster’s life. To upset the determination of *435 both the Trial Court and the Appellate Division, to tear the child from the love and care of these respondents, the only mother and father he has ever known, and send him instead to an institution until other parents are found, would be inordinately cruel and harsh. No law requires consequences so distressing.
The order appealed from should be affirmed, without costs.