Howard A. Levine, J.
Petitioner is seeking to adopt his wife’s daughter by a previous marriage without the consent of the child’s father. The issue to be determined is whether that consent can be dispensed with under section 111 of the Domestic Relations Law on the grounds that the father abandoned the child.
The child’s father and mother were married March 3, 1968 and very quickly thereafter encountered serious marital difficulties. They physically separated in May, 1968, although the mother was already pregnant, and never again lived together. The mother brought a support proceeding in Family Court in the fall of 1968, obtaining an order under which the father made payments of $10 a week until June, 1969, albeit at times only after the institution of violation proceedings. The child was born January 22, 1969.
Except for a single occasion when the father testified he saw the child at the hospital after her birth, he had no personal contact with her until July, 1970. In the interim the mother sued for divorce which he did not contest. The proof in the *746 divorce proceeding was submitted in October, 1969, but the decree was not signed until April, 1970. During the pendency of the divorce proceeding, the father and mother made an understanding that he would stay completely out of her and the child’s lives and in turn would be relieved of any support obligation for either of them. Pursuant to that understanding, the $10 a week support order was terminated by her in June, 1969.
In July, 1970 the father and mother met by coincidence and began seeing each other again for three or four weeks. They considered the possibility of reconciliation and remarriage but the mother ultimately decided against it. During this brief period, the father saw his daughter and was in her presence on a number of occasions. But, as he himself admitted, these contacts were purely incidental to his dates with the mother and did not represent a manifestation of any intent on his part to establish a relationship with the child. In fact, all contact with the child again ceased immediately upon the mother’s decision not to reconcile.
The mother married the petitioner in 1971 and they have maintained a family unit with the child since then, to which has been added a child born of this present marriage. The testimony established that it has been a cohesive family unit and that the child regards the petitioner in every respect as her father.
The next contact of the father with the child occurred in the summer of 1973. The mother’s parents rented a camp at Caroga Lake and the child, who was then four years old, stayed with her grandparents for a period of over a week during July and then visited on weekends frequently thereafter. The father happened also to be occupying a camp on the same street. They met at the public beach and on one occasion another child told her that he was her real father. Without the knowledge of the mother, the grandparents permitted her on one or perhaps two occasions to stay overnight at his camp, and she also visited him during the day on the weekends until the end of the summer. The period of contact lasted about six weeks. The father telephoned the mother seeking permission to see the child twice in September, 1973, once in December and once in January, 1974; each time he was refused. No other efforts were made by the father to seek contact with the child until the instant adoption proceeding was commenced, more than a year later, in the spring of 1975.
*747 During the entire period from the child’s birth the father has either lived in Schenectady or at Caroga Lake. Through most of this period, he has been gainfully employed in Schenectady at a substantial salary. Except for the three or four weeks in 1970 when he was dating her mother, and the six-week period in 1973, he has had no personal contact with the child since birth. With the exception of the four telephone requests during the period from September to December, 1974, he has made no effort to communicate with the child or to inquire concerning her health or welfare. Since June, 1969 he has not contributed anything toward her support, nor has ever sent or offered to send gifts to her on any of the occasions when they normally might be expected. He has never commenced a legal proceeding to enforce any rights with respect to the child.
Clearly, the total indifference of the father to the child during the first four years of her life, until the summer of 1973, meets the requirement for a finding of abandonment under the case law, beginning with the Court of Appeals’ decision in Matter of Bistany (239 NY 19 [1924]) and ending with its most recent pronouncement in Matter of Susan W. v Talbot G. (34 NY2d 76 [1974]). During that period, he neither supported, inquired, visited nor communicated to evince any interest in the child, although financially, physically and geographically able to do so. Indeed, the instant case shows less excuse for the failure to assert parental rights or assume parental obligations than was shown for a three-year period by the adolescent unmarried mother in People ex rel. Anonymous v Anonymous (10 NY2d 332), a custody case relied upon in Matter of Susan W (supra). Similarly the total inattention of the father to the child from January, 1974 until the filing of the petition for adoption in the spring of 1975 was not satisfactorily explained by him.
The issue for determination thus hinges on the effect to be given to the single spasm of attention on the part of the father in the summer of 1973, followed by the four telephone calls he made from September of that year to January, 1974. He argues that under Matter of Susan W. (supra), these contacts showed at least a "flicker of interest” sufficient to defeat the heavy burden of proof which must be met before a finding of abandonment can be made.
Analysis of the definition of abandonment applied in Matter of Susan W., however, and of the decisional law upon which it *748 was based has led me to conclude that the language of the opinion relied upon by the father should not be indiscriminatingly followed, where there has been a long period of total inattention, without further inquiry into the nature and quality of the "flicker” of interest shown.
The New York test for abandonment was enunciated at least as early as 1932 in Matter of Davis (142 Misc 681, 691) as "conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.” This was adopted by the Court of Appeals in Matter of Maxwell (4 NY2d 429, 433): "The mother did not, it is true, leave her child on a doorstep, but surely an abandonment may be established by proof of conduct less drastic than that. Just as plainly, a settled purpose to be rid of all parental obligations and to forego all parental rights spells out abandonment under section 111. When the appellant asserted that she did not want the baby and that she 'wanted’ to be done with the matter 'as quickly as possible’, when she did everything she could to conceal the child’s very birth, and hid herself behind a false name, and when thereafter she returned to Canada and for almost a year manifested not the slightest interest in the welfare of the child, his well-being or even his continued existence, she was guilty of conduct that amounted to the abandonment found by the courts below.” (Emphasis supplied.) In People ex rel. Anonymous v Anonymous (10 NY2d 332, supra), the majority also established that a substantial period of inattention alone, when unexplained or insufficiently excused, can support an inference of abandonment. Both cases were decided over vigorous dissents which would have required "!absolute and unequivocal neglect and refusal to perform a parent’s * * * obligations’ ”, based upon the "natural law and common law of the parent and child relation.” (People ex rel. Anonymous v Anonymous, supra, dissenting opn pp 337-338, emphasis supplied.)
Thus, the prevailing definition of abandonment before Matter of Susan W. emphasized the conduct of the parent as establishing his state of mind regarding parental functions, and permitted a finding of abandonment on the basis of mere unexcused or unexplained failure to exercise these parental functions. Lower court decisions, such as Matter of Anonymous (13 Misc 2d 653, 657) more explicitly described the common elements of parental obligation as follows: "On the *749 other hand, the court owes an obligation to the child and the adopting parents to find an abandonment when a proper showing has been made that the parent has neglected and refused to perform his natural and legal obligations of care and support, when he has withheld his presence, the demonstration of parental affection, or the opportunity on the part of the child to display filial affection. Failure to perform such duties by a parent constitutes a relinquishment of parental claims and an abandonment of the child”.
It follows that where there has been a protracted period of totally unjustified failure to exercise parental functions, an isolated contact or expression of interest does not necessarily negate the inference that a person no longer wishes to act in the role of parent to a child. Such was the holding in People ex rel. Osborne v Hayes (284 App Div 143). The child was left with its foster parents at nine months, in 1943. It was visited once in 1945, twice in 1949, and over a three-week period in 1950. The court rejected the claim that these contacts alone defeated a finding of abandonment (pp 146-147): "The practical and real fact is that this mother left her daughter in the hands of these relators for nearly ten years * * * Abandonment does not necessarily imply that a parent has deserted a child, or even ceased to feel any concern for its interests * * * but is simply the evidentiary fact demonstrating the relinquishment of one’s rights.”
Matter of Susan W. (supra) on its facts is not inconsistent with the foregoing analysis of the prevailing law, particularly in view of its expressed adherence to the principles of Maxwell (supra) and People ex rel. Anonymous (supra). The facts relied upon by the court showed intermittent, but also unmistakable assertions of parental rights throughout the six years of separation, i.e., the father’s visits in 1968, his contest of the prior adoption proceeding in 1970, his initiation of legal proceedings for visitation and to prevent the children’s use of the stepfather’s name in school, and yearly gifts and telephone calls. The court also relied on the father’s explanation and excuse for inattention by reason of distance and financial condition. Thus, the "flicker” of interest described by the court in Matter of Susan W. was nevertheless clearly and undeniably an interest manifested in the role of a parent; and the absences of contact and attention were also partially excused by his circumstances.
These factors in Matter of Susan W. are totally absent in *750 the instant case. Here, the father agreed in 1969 to refrain from intruding into the lives of his wife and child in return for being relieved of any support obligation. He voluntarily adhered to this agreement for a period of four years, although under not a single disability preventing him from revoking it. Apparently, he would have continued to adhere to his agreement were it not for the happenstance in 1973 of the child’s visits to her grandparents in close proximity to where he was living, when the child literally fell into his lap. After that summer, his interest consisted of four telephone calls over a period of five months, requesting permission to see the child. When this was refused he did absolutely nothing to assert any parental rights or to preserve the casual relationship he had acquired with the child, until this adoption proceeding was commenced more than a year later. In examining the nature and quality of these contacts with the child in the context of the father’s total inattention for four years before and more than a year subsequent thereto, I view them as nothing more than the attention which might*be given by a benignly interested stranger and not that of a parent.
The facts of the instant case also present an issue not passed upon in Matter of Susan W. As discussed previously, the total inattention of the father during the first four years of the child’s life clearly spells out an abandonment, which was complete well before his resumed contact, without the mother’s consent, in 1973. By that time the mother had remarried and the petitioner stepfather had already assumed all of the parental functions toward the child, for nearly two years, which he has continued to perform to the present date. As testified to by petitioner’s psychiatric expert, a strong emotional bond has been formed and today the petitioner is the child’s father in every respect other than the legal one. All this has occurred not only at the sufferance of the father but indeed through his implicit encouragement when he agreed to stay out of the child’s life at the time of the divorce. The uncontradicted expert testimony also indicated that now to intrude him into the child’s life as a new father figure would be detrimental to her emotional health. As a court of equity, this court, solely on the basis of the equivocal interest of the father in 1973, should not be required to ignore the moral and temporal interests of the child and her vital stake in the relationship which the father has permitted to form and which now awaits legal ratification. As stated by the court *751 in Matter of Davis (142 Misc 681, 692, supra): "It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent’s caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned.” (See, also, Matter of Anonymous, 198 Misc 185.)
A further basis for examining the nature and quality of the contacts of the father with the child before rejecting the claim of abandonment arises out of the enactment by the Legislature of chapter 704 of the Laws of 1975. Chapter 704 amended section 111 of the Domestic Relations Law to provide that "evidence of insubstantial and infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a finding that such parent has abandoned such child.” Similar amendments were made to the abandonment ground for dispensing with parental consent to guardianship under subdivision 6 of section 384 of the Social Services Law and to the definition of a permanently neglected child under section 611 of the Family Court Act. Chapter 704 was approved on August 9, 1975 and became effective immediately. It was introduced at the request of the Temporary Commission on Child Welfare and the memorandum submitted in its support states that it is "designed to overcome a recent Court of Appeals’ decision refusing to terminate parental rights where a natural father refused to consent to the adoption of his child, even though his contacts with his child were infrequent and insubstantial.” The memorandum also states that "a mere 'flicker of interest’ (as one Court recently characterized it) should not be permitted to serve as a basis for depriving a child of a permanent home. Where parental interest lacks substance, parental rights ought to be terminable in the best interests of the children. * * *
"In this way courts will be encouraged to consider the best *752 interests of the child in determining his legal status rather than deferring to the possessory interests of the parent”.
The foregoing memorandum establishes that the purpose of this amendment was to overrule any interpretation of Matter of Susan W. broadly restrictive of termination of parental rights based on mere contact alone without reference to whether quantitatively or qualitatively, the contact represented a meaningful performance of parental functions. The trial court is thus permitted to find an abandonment from an over-all failure to fulfill parental obligations and exercise parental rights, rather than to focus narrowly on an occasional manifestation of interest. Chapter 704 removes any implication that Matter of Susan W requires the court to presume conclusively that occasional or equivocal contact between parent and child represents an assertion of parental rights.
Chapter 704 is applicable to the instant proceeding, despite the father’s contention that this would be to give it improper retroactive effect. His parental status is not a "vested right”, as that phrase has been defined for constitutional purposes. (Cf. Gleason v Gleason, 26 NY2d 28, 40; Schacht v Schacht, 32 AD2d 201.)
Whether a statute is to be applied to facts occurring antecedently to its enactment depends in the first instance upon legislative intent. (Gleason v Gleason, supra; Longines-Wittnauer Watch Co. v Barnes & Reinecke, 15 NY2d 443.) The purpose of chapter 704 outlined in the previously quoted memorandum was "To facilitate the freeing for adoption of abandoned and permanently neglected children”. The memorandum also recites that the bill’s fiscal implications "should result in fiscal sayings to the State and counties to the extent that foster care expenditures will be reduced through the freeing of more abandoned and permanently neglected children for adoption.” Clearly, the strongly expressed legislative purpose comprehensively to remove court-created artificial barriers to adoption would be thwarted indefinitely if previous insubstantial or infrequent flickers of interest remained an absolute bar to termination of parental rights.
Moreover, under traditional canons of statutory construction, chapter 704 qualifies for retroactive application as a procedural and remedial statute. (Longines-Wittnauer v Barnes & Reinecke, supra.) It is procedural in changing the *753 evidentiary weight to be given to previous parental contacts on the ultimate factual issue of abandonment. It is remedial in its expansion of existing statutory remedies for achieving adoption through the termination of parental rights to refuse to consent. It is also clearly remedial as a legislative determination to overrule what was considered to be the harsh and unjust results of a previous court decision. Such enactments have frequently been held applicable retroactively, even to proceedings pending at the time of enactment. (See Gallewski v Hentz & Co., 301 NY 164; People v Cornish, 21 AD2d 280; Matter of Robinson [Catherwood], 11 AD2d 374; Banco Nacional de Cuba v Farr, 243 F Supp 957.) It is particularly noteworthy that the Court of Appeals, in Matter of Ray A.M. (Anonymous) (37 NY2d 619, 621-622) applied a companion amendment to the permanent neglect statute (L 1975, ch 701), also affecting parental rights, to a case decided by the trial court before the date of enactment: "The courts below decided the issue based upon the statute as it then read. Former section 614 (subd 1, par [e]) required that permanent termination of custody be in the 'moral and temporal’ interests of the child. Chapter 701 of the Laws of 1975 amended section 614 (subd 1, par [e]) to read 'best’ instead of 'moral and temporal’ interests, and added to section 631 a requirement that an order of disposition on an adjudication of permanent neglect be made solely on the basis of the best interests of the child. This court decides the case on the basis of the law as it exists today (see Strauss v University of State of N. Y., 2 NY2d 464, 467, and cases cited). The result in this case, on its facts, would be the same under either statutory standard.” (Emphasis supplied.)
In the context of the father’s total abdication of parental prerogatives throughout the child’s life, six weeks of contact in six years, followed by four telephone calls, are in my view both "infrequent” and "insubstantial” within the intendment of the statute. Since I have already found that these contacts did not manifest an intention to assert rights or accept responsibilities as a parent, I conclude that an abandonment has been established and that the adoption of the child by the petitioner without the consent of the respondent, Larry T., may be granted.
The Schenectady County Probation Department is therefore directed to conduct the investigation required under section 116 of the Domestic Relations Law to determine whether *754 granting such adoption is in the moral and temporal interest of the child.