OPINION OF THE COURT
Millard L. Midonick, S.
In these two adoption proceedings the petitioners are two women into whose care the natural mother had voluntarily entrusted one of each of her twins almost 15 years ago and both of whom are now seeking to adopt them. Both petitioners *424 and respondent mother are unmarried. Petitioners urge that the consent of the natural mother to the adoption is unnecessary because she has abandoned the twins. The natural mother withholds her consent to the adoption and denies that she has abandoned her children, claiming she has been unable to locate them. A hearing was held at which the natural mother, the prospective adoptive parents and the twins testified.
The evidence presented at the hearing established that the twins, a male and a female, were born on August 27, 1962. At their birth, their mother, then a 19-year-old asthmatic, was receiving public assistance. Before these twins were born, their mother had had another child aged one year who was in her custody. The twins and their sibling were all born out of wedlock and no father is named on any one of the three birth certificates. It is conceded that when the twins were approximately three months old, each petitioning adoptive mother gained custody of one of the twins from their natural mother. The natural mother acknowledges she was unable to care for these twins shortly after their birth, but insists that the adoptive mothers merely volunteered to care for her children until she could support herself and her family.
The female twin has continued to reside with the first petitioner and her "common-law husband” since she was three months old. The first petitioner moved three times within the same general location since 1962. The prospective adoptive mother of the female twin proved that a notarized affidavit had been signed by the natural mother in 1967 in which the natural mother acknowledged she had given full and complete custody of her child to the first petitioner to raise as her own with a view toward later adoption. The signature on the affidavit clearly appears to the court to be that of the natural mother, and it is so found. Her unsworn questioning of the signature was merely the result of a memory lapse which is understandable after so many years. Apart from the isolated occurrence of the signing of the affidavit in 1967, no contact was had between the natural mother and the first petitioning adoptive mother or between the female twin and the natural mother between 1963 and 1976. It is conceded that the natural mother has never supported the female twin, but since 1976, when she found both twins, she has sent birthday cards and a Christmas gift and has visited with her daughter.
The male twin has resided with the second petitioner since *425 she obtained his custody except for a brief stay in the South with the mother of that petitioner whom the twin considers his grandmother. The second adoptive mother has also moved several times. It is conceded that the natural mother has never supported the male twin, but since 1976 has sent Christmas cards, telephoned and has made one visit to her son. Between 1963 and 1976 the second petitioner heard from the natural mother only once. Contact with both mothers was re-established by the natural mother in 1976 through a chance meeting with another friend who was acquainted with all the parties herein.
Both children asked unequivocally that they be allowed to be adopted by their foster mothers, and remain with the only families they have ever known. They exhibit no feeling for their biological parent and in fact resent and avoid confrontation with her and appear hostile toward her. They indicate they are well integrated into the families of their adoptive mothers. The twins see each other frequently and testified that should their legal status as brother and sister be severed by their adoption by different mothers, they will continue to consider each other as siblings. The separation of siblings, while "unfortunate”, is the result of more than 13 years of abandonment by their mother, and cannot stand in the way of adoption if that be in their best interests. (Matter of Malik M., 40 NY2d 840.)
 The natural mother argues that she did not abandon her children. She urges that because she lost contact with the twins when the first petitioning adoptive mother moved away, this is a valid excuse for her lack of contact for about 13 years. She attempted to locate the children by visiting various agencies including the Bureau of Missing Persons and by searching the phone book. Lacking the funds to hire a private detective, she was unsuccessful in her search. Since the birth of the twins the natural mother has given birth to two more children, one of whom was given away to the custody of an acquaintance of the two petitioning mothers. Although the natural mother moved to Boston for a brief period, at present she resides with two of her five children in New York City and is employed in a position where she works with mentally retarded children. The natural mother has impressed the court as an articulate and self-supporting member of the community sincerely interested in reuniting her family.
Nonetheless, the facts as presented indicate that in spite of *426 the natural mother’s recent attempts to reunite her family, she had previously abandoned her twins. (Domestic Relations Law, § 111, subd 2, par [a].) The natural mother has failed to show that her inability to locate her twins was "good reason” for nonvisitation and noncommunication for a period far exceeding the statutory requirement of six months (Domestic Relations Law, § 111, subd 2, par [a]). "In the absence of evidence to the contrary, the ability to visit and communicate with a child or person having custody of the child shall be presumed.” (Domestic Relations Law, § 111, subd 6, par [a].) Respondent’s only evidence to the contrary is her own self-serving testimony that she visited agencies and searched phone books. Indeed, it appears, according to the testimony at the hearing, that if not for a fortuitous meeting with a third party she still might not know the whereabouts of the twins. In view of the protracted separation of 13 years involved, the natural mother’s failure to document her efforts to find her children who in fact continued to reside not far from where she originally lived must result in a finding of abandonment. Had she kept in weekly or other closely spaced periodic contact with the custodial petitioners, or either of them since they were in touch with one another, she never would have lost these twins. Her testimony is merely evidence of subjective intent and cannot preclude a determination that her consent to her children’s adoption shall not be required, "(c) The subjective intent of the parent or other person having custody of the child, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph (a) of subdivision two manifesting such intent, shall not preclude a determination that the consent of such parent or other person to the child’s adoption shall not be required.” (Domestic Relations Law, § 111, subd 6, par [c].) The affidavit which she signed does not qualify as a surrender under section 111 (subd 2, par [b]) of the Domestic Relations Law, but it does permit the inference that the natural mother intended to forego her parental rights as to one twin and also by inference as to both twins. The natural mother’s recent attempts to reunite her family are not timely acts of parental interest sufficient to overcome the strong evidence of a lengthy period of abandonment. "Flickers of interest” (Susan W. v Talbot G., 34 NY2d 76, 80) are no longer in themselves sufficient as a matter of law to preclude a finding of abandonment. (Domestic Relations Law, § 111, subd 6, par [b].) The "flickers of interest” exhibited by the natural mother and occurring long after the statutory *427 period for abandonment had been met, cannot negate the fact that for 13 years the natural mother failed to visit or support her children. Between 1963 and 1976 the natural mother exhibited " 'a settled purpose to be rid of all parental obligations and to forego all parental rights’ ”. (See Matter of Susan W. v Talbot G., supra, p 80; Matter of Maxwell, 4 NY2d 429, 433.) The abandonment has been proven even giving due consideration to the impoverished and disadvantaged conditions which had befallen the natural mother and which in part "contributed to the abandonment.” (Matter of Malik M., 40 NY2d 840, 841, supra; Matter of K. W. V., 92 Misc 2d 292.)
Matter of Goldman (41 NY2d 894) cannot and should not control here for several reasons. There the 14-year-old infant ("about to reach his majority” by the time of the Court of Appeals decision [p 896]) had spent the first eight years of his life with his natural mother, not the first four months as here. There the natural mother was impeded by the father in her attempts to visit and communicate with her son during the years 11 through 14; here she failed to keep in contact for 13 long years without any impediment from the petitioners except her own failure to visit regularly and thereby losing their addresses. There the natural father had custody and was not about to lose it to the natural mother even if the stepmother was not allowed to adopt; here the petitioners are mere unrelated foster parents who may be unable to fend off a natural mother’s insistence on custody unless permanent adoption is awarded. In view of the swiftly changing attitudes of the Legislature and of the Court of Appeals in matters affecting adoption, and in view of the unusual facts in Goldman leading to divided opinions in the appellate courts, it is questionable whether Goldman will be extended beyond its essential fact, that contested adoption of a child "about to reach his majority” is virtually mooted when a child is past his 17th birthday. (Cf. Matter of Goldman, supra, p 896.)
Finally, it is questionable whether two 15-year-old twins can or should be compelled to suffer uncertainty of continuity in their stable home of 13 years’ standing in their foster mothers’ homes. The only certainty is adoption. The constitutional rights of these children have by this time ripened into a right to adoption. It was so indicated in Rothstein v Lutheran Social Servs. of Wis. & Mich. (405 US 1051) where the Supreme Court held that due regard must be given to the length of time that the infant has been in foster care. Rothstein was *428 an adoption case, and by giving such due regard, on remand to the Wisconsin courts the natural father was overruled in his opposition to adoption by a stepfather. (59 Wis 2d 1.)
In granting the petition for adoption this court recognizes that a child has a right to emotional nurturing as well as to physical well-being. (The Rights of Children: A Trust Model, 46 Fordham L Rev 669, 729.) Not only do children have a right to emotional nurturing but courts have a duty to protect that right and to continue it to its fullest extent by granting those who have provided the emotional nourishment the right to adopt their charges.
With respect to the statutorily mandated superior rights of a natural mother (as here) or a married father, over those of an unmarried father involved in Orsini v Blasi (423 US 1042, dsmg app from Matter of Malpica-Orsini, 36 NY2d 568), it is questionable whether children of an unmarried mother as here, cannot be afforded equal protection with children of an unmarried father. (See Matter of Benjamin, 93 Misc 2d 1084.)
If any case deserves classification under "extraordinary circumstances”, and consequent reliance on best interests of children, this 13-year estrangement of twins from their mother is the plain exemplar. (Cf. Matter of Bennett v Jeffreys, 40 NY2d 543, 546 [a custody holding where it was observed that "a child is a person, and not a subperson over whom the parent has an absolute possessory interest.”]) To deny the petition for adoption would serve only to preserve an empty shell of parental status and would contravene the best interests of these children. To deny the adoption petition and grant merely custody to the petitioners would serve only to continue these children in limbo and preclude them from enjoying a permanent home. A permanent adoptive home is necessary to serve the best interests of the children. Although we hold that these twins have been abandoned by their mother, we further hold that were this not so, their constitutional rights based upon their plain "best interests” would require any court to free them for adoption. (Cf. Matter of Malpica-Orsini, supra; see Matter of Benjamin, supra.) See, also, the recent opinion where the Supreme Court unanimously found that an unwed father was lacking in fitness to veto the adoption of his child, saying: "But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of *429 parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the 'best interests of the child.’ ” (Quilloin v Walcott, 434 US 246, 255.)
Accordingly, all of the facts found above, and the fact that the race and religion of all persons concerned are the same, lead unmistakably to the conclusion that adoption by the petitioners, the long-term custodians of the twins, should be granted in the best interests of these abandoned children.
However, in the unusual posture of this matter, since no licensed adoption agency has been involved, the decree providing for final adoption is hereby stayed until either the Adoption Division of the New York City Bureau of Child Welfare or the investigator on this court’s adoption staff (whichever can report sooner) shall have submitted to this court a home investigation of both adoptive parents to reassure that those homes are as fine as they appeared to be at the hearing. That both homes will be approved seems highly probable since no such issue was raised, and since the appearance and conduct of the petitioners and the appearance and demeanor of both twins impressed this court as though they had been raised as outstanding citizens in an excellent environment.
Submit orders on notice indicating adoption will be granted for the reasons set forth, subject to home visit reports.
Thereafter, submit decrees on notice after home investigations and further court approval.