OPINION OF THE COURT
Bertram R. Gelfand, S.
This is an application by the maternal grandparents seeking the adoption of a male child born out of wedlock on February 19, 1977. The infant’s mother has consented to the adoption. The putative father is named on the child’s birth certificate and has acknowledged paternity. The child bears his family name. Represented by counsel of his own choice, the respondent father has appeared in opposition to the application.
Petitioners do not dispute that respondent is the child’s father. It is their position that the application should be granted as in the best interests of the infant without regard to the opposition of respondent. In support of this position petitioners present alternative arguments which they contend would support a conclusion that respondent does not possess an absolute right to veto the relief sought if it is in the child’s best interests. Primarily they contend that, as a matter of law, a putative father has no absolute right to veto the adoption of his child. In the alternative, petitioners argue that if this respondent possesses any such veto right, he has forfeited it by dint of his abandonment of the infant. It is respondent’s position that he has not abandoned the infant and that in the absence of a finding of abandonment his consent is required to the adoption.
The evidence adduced at the hearing established that the infant’s natural mother first met respondent in March, 1976. She became pregnant in July, 1976. In September, 1976 she left the house of petitioners and she and respondent began to cohabit in the apartment of respondent’s grandmother. During this period they were both essentially self-supporting. The child at issue was born prematurely on February 19, 1977. This necessitated his remaining in the hospital for approximately one month after his birth. During this period respondent visited the child in the hospital almost daily. Approximately one week after the birth of the child the natural mother and putative father separated. The natural mother returned to her parents’ home, to which she also brought the infant after his discharge from the hospital. Both the natural *920 mother and the infant continue to be members of petitioners’ household. Although respondent did not bear any of the expenses of the birth, it was conceded that he was not requested to and that he was never in the posture of refusing to share in meeting these expenses.
In the approximately one month between the infant’s discharge from the hospital and respondent’s entry into the army in April, 1977, he visited the child at the home of the maternal grandparents on three occasions. Respondent never applied for an allotment for the infant’s support. However, on one occasion during respondent’s brief military service he communicated with the mother and sent her approximately $100 in support. It appears that shortly thereafter respondent suffered the nervous breakdown which resulted in the hospitalization that led to his discharge from the military service in July, 1977. Thereafter he was hospitalized in a Veteran’s Administration hospital followed by confinement at home for a period of 6 or 7 months.
Prior to his entry into the military service respondent was employed by the New York City Department of Social Services. For a period continuing until August 8, 1978, respondent’s illness prevented his return to this, or any other permanent employment. On that date he rejoined the Department of Social Services.
It was the testimony of the natural mother that the only time respondent saw the child thereafter was during the Christmas season of 1978. Respondent contends that he saw the child on several occasions and that he frequently called petitioners to inquire about the child’s health. Respondent fixed his visits at between 3 and 4 since August 8, 1978. His telephone calls he numbered at approximately 10. He contended he left money and/or gifts on each visit. This was denied by the natural mother. Respondent’s present position is that he is ready, willing and able to support the child and that he has offered to support the child. The existence of this offer was not refuted by petitioners. Respondent presently earns $303 net biweekly and would be willing to contribute between $20 and $50 biweekly for the support of the infant. It was also testified by respondent that the infant is the named beneficiary on his life insurance policy.
The threshold question of law that must be addressed is whether respondent, in the absence of abandonment, has the right under the laws of this State, if he chooses, to arbitrarily *921 veto the application. The answer to this question is controlled by the decision of the United States Supreme Court in Caban v Mohammed (441 US 380). The import of this case is that to the extent section 111 of the Domestic Relations Law establishes a gender-based distinction between the rights of the male parent and female parent, this statute is constitutionally infirm.
The court cannot rewrite the existing statute. It must be applied as it stands limited only by the extent to which it has been determined to be constitutionally offensive to the equal protection clause. The Caban case cannot conceivably be interpreted as striking down section 111 of the Domestic Relations Law so that the rights that the section confers on female parents are taken away from them by case law. Accordingly, the section as it now stands must be read as giving the same rights to male nonmarital parents as it gives to female non-marital parents. This does not mean that the Legislature is necessarily precluded from evolving a new statutory scheme which meaningfully differentiates between unwed fathers and unwed mothers that is not the "undifferentiated distinction” based solely on gender which the majority of the United States Supreme Court found unconstitutional. Such a statutory revision, however, is a task for the Legislature and not within the jurisdiction of the judicial branch of government. Likewise, it is not here necessary or pertinent to embark on an exploration of where in the spectrum of human relationships the lack of "substantial relationship” referred to by the United States Supreme Court in the Caban case relates to the term "abandonment” as used in New York law.
Pursuant to section 111 of the Domestic Relations Law a mother could veto the adoption of her child unless the necessity for her consent was obviated by one of the following specific exceptions set forth in subdivision 2 of section 111 of the Domestic Relations Law:
"The consent shall not be required of a parent or of any other person having custody of the child:
"(a) who evinces an intent to forego his or her parental or custodial rights and obligations as manifested by his or her failure for a period of six months to visit the child and communicate with the child or person having legal custody of the child, although able to do so; or 1
"(b) who has surrendered the child to an authorized agency *922 under the provisions of section three hundred eighty-four of the social services law; or
"(c) for whose child a guardian has been appointed under the provisions of section three hundred eighty-four-b of the social services law; or
"(d) who has been deprived of civil rights pursuant to the civil rights law and whose civil rights have not been restored; or
"(e) who, by reason of mental illness or mental retardation * * * is presently and for the foreseeable future unable to provide proper care for the child.”
Accordingly, it must be concluded that Caban v Mohammed (441 US 380, supra) gives to the respondent in this case the same rights. In this case respondent, in the absence of abandonment being proven has an absolute right as a matter of law to veto the granting of this application (see Domestic Relations Law, § 111).
There remains the question of whether the proof adduced established that respondent abandoned the infant. The Court of Appeals in Matter of Cory L. v Martin L. (45 NY2d 383, 391) recently poignantly summarized what constitutes abandonment pursuant to section 111 (subd 2, par [a]) of the Domestic Relations Law as "such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights — a withholding of interest, presence, affection, care and support.” (See, also, Matter of Susan W. v Talbot G., 34 NY2d 76; Matter of Maxwell, 4 NY2d 429.)
The petition for adoption was filed on December 4, 1978 and it was not controverted that respondent saw the child in August, 1978 and, thereafter, at Christmas of 1978. The hearing was completed barely six months after Christmas, 1978. If the period prior to the hearing is not included then at best, there is a four-month interval during which time respondent did not actually see the child, but only communicated with the child’s grandmother in whose household the child resided. To these circumstances should be applied the following premise: "While there may be instances when the interval between the commencement of a proceeding and the formal hearings should be considered as part of the period of abandonment, in this context inclusion of this segment manifests the lack of evidence in support of the determination” (Matter *923 of Corey L. v Martin L., supra, p 390, citing Matter of Beshures, 41 AD2d 1016).
While respondent’s relationship with his child may fall short of that of a model parent, it cannot be concluded that at this time the proof establishes that respondent has evinced a "purposeful ridding of parental obligations and foregoing of parental rights — a withholding of interest, presence, affection, care and support” (Matter of Corey L. v Martin L., supra, p 391). In reaching this conclusion, consideration is given to the totality of the testimony that indicates that respondent’s involvement in nonmarital paternity, climaxed by his breakup with the child’s mother that was almost directly followed by his leaving his civilian career to enlist in the army, appears to have had a profound impact upon him that led to a serious, temporary mental breakdown that continued for a substantial portion of the life of the child. To the extent respondent’s mental disability interfered with his exercising parental responsibility and concern, that period cannot be deemed to have involved a willful abandonment of the infant by respondent.
Accordingly, on the proof adduced in this proceeding it is determined that petitioners have not established by a preponderance of the credible evidence that respondent has forfeited any parental right as a result of having abandoned the infant. Respondent’s consent to the application is therefore an essential element that is required for it to be granted. In the absence of such consent the application is denied at this time without prejudice to it being renewed at such time as any change in circumstances would suggest to these petitioners or any other appropriate petitioners, that the application be renewed.
It is noted that respondent is no longer disabled. He has indicated a willingness to meaningfully support the infant and participate in sharing the responsibility for the infant’s proper development. He has further indicated a strong desire to maintain a relationship with the infant by regular reasonable visitation. If he wishes to retain his parental status, respondent should remain ever sensitive to the fact that he must translate his, promises of support, paternal interest, and responsibility into a regular pattern of conduct.